UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LAURA WASKIEWICZ,

      Plaintiff,                                      Case No. 12-cv-11250

vs.                                              HON. MARK A. GOLDSMITH

FORD MOTOR COMPANY
SALARIED DISABILITY PLAN,

      Defendant.

_____/

## OPINION & ORDER
## GRANTING PLAINTIFF'S MOTION FOR JUDGMENT (Dkt. 148)

This matter is before the Court following remand from the Sixth Circuit. Plaintiff Laura Waskiewicz was employed by Ford Motor Company from 1990 until she was terminated in 2010. UniCare, the claims processor for Defendant Ford Motor Company Salaried Disability Plan ("the Plan"), denied Waskiewicz disability benefits because she was not employed at the time she applied for such benefits, a decision which this Court affirmed on March 20, 2014. Waskiewicz v. UniCare Life & Health Ins. Co., No. 12-11250, 2014 WL 1118501 (E.D. Mich. Mar. 20, 2014). The Sixth Circuit reversed this decision in an October 15, 2015 opinion, noting that "plaintiff's application was denied because she failed to follow time-sensitive provisions that were neglected because of that very illness" for which she sought benefits. Waskiewicz v. UniCare Life & Health Ins. Co., 802 F.3d 851, 853 (6th Cir. 2015). The Sixth Circuit ordered that "[o]n remand, plaintiff shall be given the opportunity to show that her alleged failure to comply with certain of the requirements found in Section 3 of the Plan was due to the very disability for which she seeks benefits." Id. at 856.

Following remand, the parties engaged in additional discovery, and have submitted a record to the Court consisting of nearly 3,000 pages.[1]  The parties now seek judgment on the record.  For the reasons that follow, the Court grants Waskiewicz's motion for judgment on the record.

## I.     BACKGROUND

### A.  Termination of Employment and Denial of Benefits

Waskiewicz was employed by Ford Motor Company as a product design engineer from 1990 until October 26, 2010.[2]  Waskiewicz, 802 F.3d at 852.  On October 25, 2010, she suffered a debilitating emotional breakdown following a conversation with her supervisor, Tom Erickson, regarding her repeated failures to timely report to work.  RC 2660.  She left and did not return to work.  Waskiewicz, 802 F.3d at 853.  The following day, Erickson reported her absence to Tamika Pettway in Ford's Personnel Relations department.  RC 2661.  Pettway mailed a letter to Waskiewicz on October 28, 2010, advising her that her absence from work was not authorized.  RC 2894.  The letter stated that if Waskiewicz was unable to report to work for medical reasons, satisfactory medical documentation had to be provided to Gate 4 Medical.  Id.  If her absence was for non-medical reasons, documentation should be submitted directly to Pettway.  Id.  The letter further stated that a failure to provide this information within five business days of the letter would result in termination of Waskiewicz's employment effective October 25, 2010.  Id.

This letter was sent to the wrong address and was returned to Ford on November 8, 2010.

---

[1] Citations to the compiled record will be indicated by "RC."

[2] As noted previously by this Court, Waskiewicz, 2014 WL 1118501, at *1 n.1, and the Sixth Circuit, Waskiewicz, 802 F.3d at 854 n.2, it is unclear whether Waskiewicz was terminated on October 25 or October 26.  As the Sixth Circuit adopted the October 26 date, so too does this Court.

RC 2756. Nonetheless, Pettway sent a termination letter to Waskiewicz on November 18, 2010. RC 2855. The letter stated that, as a consequence of failing to provide satisfactory documentation to justify her absence, Waskiewicz was "being released from employment as a 'voluntary quit' effective October 26, 2010." Id. A copy of the October 28 letter was attached to the termination letter.

Waskiewicz received the termination letter on November 23, 2010. RC 2756. That same day, Waskiewicz's father, Jack Waskiewicz, contacted his daughter's physician, Dr. Pamela Rockwell. RC 2066. Dr. Rockwell, a family physician, had been treating Waskiewicz for her depression since October 19, 2009, and had found on two previous occasions (in October 2009 and June 2010) that Waskiewicz's depression prevented her from being able to work for a period of time. RC 90-91, 111-112, 785, 2472. Waskiewicz also emailed Dr. Rockwell on November 23, saying that she "ha[d] ben unable to maintain a regular schedule at work for some time now and things just got to a point where I had to leave. This happened about a month ago and since then I have sort of been detached from everything and everyone until now." RC 2536.

Dr. Rockwell saw Waskiewicz on November 24, 2010. RC 737. Waskiewicz told Dr. Rockwell that she had been feeling very depressed, and had not reported to work since October 25. Id. Waskiewicz described herself as "being in a fog with her brain not being in sync with her body movements." Id. She had stopped taking Effexor, a medication for depression, but continued to take her daily doses of insulin. Id.

On November 26, 2010, Waskiewicz emailed Dr. Rockwell, asking her to provide documentation that Waskiewicz had been unable to report to work for medical reasons since October 25. RC 2542. Waskiewicz offered to come to the clinic to pick up the letter and fax it to the appropriate location at work. Id. Dr. Rockwell agreed, id., and on November 29, wrote a letter

stating that Waskiewicz "has been unable to work since October 25, 2010. She is under my care and her return to work date is indeterminate at this time," RC 2953. This letter was faxed to Gate 4 Medical on November 30, 2010. RC 2954.

Jack Waskiewicz called UniCare on December 1, 2010, to initiate his daughter's claim for disability benefits. RC 61. UniCare told him to contact Ford to initiate the disability-leave process. RC 62. UniCare also stated that Waskiewicz would need to have the Disability Certification Form completed by her physician and submitted to UniCare immediately. Id. On December 13, 2010, UniCare received certification from Dr. Rockwell that Waskiewicz had been disabled due to depression, poorly-controlled Type I diabetes, and "transgender" issues (not further explained in the Disability Certification Form) since October 25, 2010, and would be unable to return to work for an indeterminate period of time. RC 67, 125. On December 22, 2010, UniCare sent a letter informing Waskiewicz that her application for benefits was denied because she had been terminated as of October 25, 2010, and persons who are not employed are not covered under the Plan. RC 70-71.

In March 2011, UniCare received a Disability Certification Form from Dr. Sandra Samons, who started seeing Waskiewicz regularly on December 2, 2010. RC 75. On March 23, 2011, UniCare sent Waskiewicz a second denial of benefits letter, explaining:

> As stated in our previous letter dated December 22, 2010, UniCare has received information from Ford Motor Company indicating that effective October 25, 2010, you are no longer employed as a regular salaried employee. According to the Salary Plan dated January 1, 2010, persons who are not employed as a regular salaried employee are not covered under the plan, and are not eligible for disability benefits.
>
> [ . . . ]
>
> Your disability claim has been denied based on the requirements provided in the Ford Motor Company Salary Plan Language effective January 1, 2010, Section 2, entitled "Definitions",

4

subsections 2.08 and 2.13, and Section 3 Eligibility for Benefits (I, ii iv) which state:

[ . . . ]

Section 3. Eligibility for Benefits.  As used in the Plan, a Covered Employee must meet the following conditions:

(i) Must be an Active Employee with a Disability.

(ii) Must be an Employee receiving appropriate care and treatment from a physician practicing within the scope of his/her license and be complying with the prescribed treatment plan.

(iv) Must provide proof of Disability including, but not limited to objective and clinical evidence of the Disability at the time of commencement of the Disability and throughout the duration of the Disability.

RC 114-115.

## B.  Litigation

Waskiewicz filed the instant complaint on March 20, 2012.  This Court granted summary judgment in favor of UniCare after determining that, under an arbitrary-and-capricious standard, the rationale for denying Waskiewicz's benefits – "that Plaintiff was not eligible to apply for benefits because she was not an employee of Ford at the time of filing the disability claim" – was a reasonable decision.  Waskiewicz, 2014 WL 1118501, at *7.[3]  In so doing, the Court rejected Waskiewicz's argument that, because she qualifies as an "Active Employee" under Section 3 of the Plan, her subsequent termination did not bar her from applying for benefits.  Id. at *10.  The Court noted that Waskiewicz needed to comply with all of the eligibility requirements in Section 3, one of which required her to be an "Employee" – which she was not at the time she applied for benefits.  Id.

---

[3] At that time, UniCare was a defendant in the case.  After the case was remanded, the Plan intervened as a defendant, 7/27/2016 Stip. Order (Dkt. 104), and UniCare was dismissed without prejudice, 9/8/2016 Stip. Order (Dkt. 108).

The Sixth Circuit approached the case in a different light on appeal. The court noted that, according to UniCare's files,

> [Plaintiff's] father called re [plaintiff's] benefit status. Advised that [plaintiff] was first treated November 24th, disability would have commenced that date[,] however, [plaintiff] was [terminated] and therefore not eligible for benefits. Father stated [plaintiff] was catatonic since 10/25/10 and could not see a Dr.... Advised father of the policies in the Salary Plan that [contact] must be made w/in first 7 days, father asked for an exception. Advised that we administer Plan and explained Appeal process.

Waskiewicz, 802 F.3d at 854 (quoting RC 74). The court reasoned that Waskiewicz's failure to comply with the notification deadlines outline in Section 4.02 of the Plan was "not surprising given that she was suffering from severe mental illness and was unable to comply due to the very disability for which she sought coverage." Id. at 855. UniCare's denial of benefits based on Waskiewicz's retroactive termination was arbitrary and capricious, said the court, and appeared inconsistent with "the spirit of employer-provided health care benefits generally and with this Plan specifically." Id. at 855-856.

The Sixth Circuit stated that it was "hard pressed to believe that plaintiff's failure to comply with reporting deadlines prescribed by the Plan should result in the denial of benefits as long as the failure to comply was directly caused by the disability itself. Of course, it is up to the employee to make that showing, but if she does so, then benefits may not be denied." Id. at 856. Despite this language regarding the "reporting deadlines," the court went on to give the following instruction regarding remand: "On remand, plaintiff shall be given the opportunity to show that her alleged failure to comply with certain of the requirements found in Section 3 of the Plan was due to the very disability for which she seeks benefits." Id.

### C. Waskiewicz's Disability in October – November 2010

On remand, the parties have accordingly focused on Waskiewicz's mental state between

October 25, 2010 and November 24, 2010, in order for this Court to make the determination required by the Sixth Circuit's remand.

Between the time that she left her job on October 25, 2010, and the time that she contacted Dr. Rockwell on November 23, Waskiewicz had little contact with others. Waskiewicz's family members offered their recollections of her behavior during this time. Jack Waskiewicz told Dr. Rockwell's office on November 23 that he had been unable to contact his daughter for over fourteen days, and that he found Waskiewicz "in a[n] unfunctional state[], disoriented and weak, scared." RC 2534. Waskiewicz also reportedly "had 6 weeks of mail in [her] mail box that [s]he has not opened." Id. Jack Waskiewicz testified that, around November 19th or 20th, he found her laying in a tire in the rain at the home of Deanna Beckett, Laura's sister. RC 2377-2378.

Deanna testified that Laura came to her house on her own initiative at some point in the fall of 2010, though she could not pinpoint the precise date. RC 2226. Deanna recalled that both of their parents were also at the house at this time, and that all three were present when Deanna arrived home. RC 2227. She did not recall Laura in tears at any point during the evening, RC 2234, nor did she recall any incident with Laura sitting outside in the rain, RC 2236.

Cecelia Waskiewicz, Laura's mother, testified that Deanna called her on the day that Laura was terminated from Ford. RC 2450. Cecelia and Deanna went to Ford and took Laura home. RC 2451. Cecelia Waskiewicz did not recall much between that day and November 24, including whether she had made any specific attempts to contact Laura. RC 2452. She recalled accompanying Laura to her appointment with Dr. Rockwell on November 24, but did not recall specifically what was discussed during that appointment. Id. Cecelia did not recall seeing Laura prior to this appointment. Id. When asked if she knew what Laura was doing during the time between October 25 and November 24, Cecelia testified that "the pattern is she is home. She has

the blinds pulled, she's in the dark, she sleeps most of the day. There is no reason to think that period of time was any different." RC 2453.

The Plan points out instances of Waskiewicz taking trips to the grocery store or running errands during this time. According to bank statements, Waskiewicz made trips to Kroger on October 25, October 30, November 6, November 12, and November 22. RC 2438. She withdrew cash from an ATM on November 12, and again on November 23. Id. She refilled her prescription of Estradiol at a Kroger Pharmacy on November 2, and refilled her prescription of Lantus on November 12. RC 2437.

Several doctors who treated Waskiewicz have offered their opinions regarding her mental condition during this time. On March 3, 2011, Dr. Rockwell wrote a letter to Gate 4 Medical which stated that Waskiewicz "was unable to work and incapable of responding to correspondence in the weeks prior to her appointment with me on November 24, 2011 [sic]. . . . She was and is suffering from a debilitating depression and is currently under treatment. She was emotionally unable and incapable of interacting with others during the weeks prior to her appointment with me." RC 2944.

In her 2017 deposition, Dr. Rockwell testified that Waskiewicz was a "very troubled individual. . . . troubled enough that she couldn't behave in a way that was helpful to her." RC 2478. She explained that "[m]ental illness is very complicated and people have ups and downs[.]" Id. Dr. Rockwell was asked if she ever asked Waskiewicz "why she did not earlier call her family for support?" Dr. Rockwell responded, "No. She was incapable. She was incapable of getting to my office on time for her appointments. . . . It's a problem with depression and anxiety." Id.

Dr. Rockwell admitted that she did not actually observe Waskiewicz during the period from October 26 to November 24. However, she stated that her opinion regarding Waskiewicz's state

at that time was due to her prior interactions with Waskiewicz: "[A]t other times in her life she was fully incapacitated. And she [sic] when she did come up to my appointment late, she often was unkempt, smelled, her clothes were filthy. . . . Frankly, I'm very surprised she didn't end up in the hospital in a metabolic state." RC 2484. Dr. Rockwell also testified that, in November 2010, Waskiewicz was "clinically worse" than at any previous time Dr. Rockwell had seen her. RC 2490.

Waskiewicz also saw a psychologist, Dr. Sandra Samons, on two occasions in 2009; she began treating regularly with Dr. Samons on December 2, 2010. RC 127, 204-205. Dr. Samons wrote a letter referring Waskiewicz to the University of Michigan Department of Psychiatry on February 22, 2011. RC 127. In the letter, Dr. Samons wrote that "[o]n October 25, 2010 Laura became so immobilized by depression that she stopped going to work and was unable to follow standard procedure for obtaining a LOA [leave of absence]." RC 128. In a June 24, 2016 letter, Dr. Samons described Waskiewicz as being "in pretty desperate condition" on December 2, 2010, saying that Waskiewicz "had experienced a bout of depression so completely immobilizing that she had been unable to get out of bed[.]" RC 205.

Dr. Beverly Blaney, Ford's staff physician, reviewed the February 22, 2011 letter submitted by Dr. Samons, and concluded on February 25, 2011 that Waskiewicz was "[u]nfit for work." RC 2939.

After this case was remanded by the Sixth Circuit, the Court ordered Waskiewicz to undergo a medical examination conducted by Dr. Liza Gold, M.D., a clinical and forensic psychiatrist selected by the Plan. 10/24/2017 Order (Dkt. 128). Dr. Gold found that between 2008 and 2010, Waskiewicz was in a "difficult, painful, and downward spiral of depression and hopelessness in relation to her Gender Identity Disorder. By the end of 2010, Ms. Waskiewicz

became so psychiatrically impaired that she was completely disabled in regard to being able to maintain full-time employment as an engineer." RC 2723-2724. Dr. Gold wrote in her report that Waskiewicz has a "complex psychiatric history that includes Major Depressive Disorder, Recurrent and Gender Disorder," and was diagnosed with "'Axis II' personality features including avoidant personality features and Borderline Personality Disorder." RC 2759. In her deposition, Dr. Gold explained that, in the context of dealing with Waskiewicz, borderline personality disorder was "a constellation of . . . typically maladaptive personality and/or interpersonal and/or coping traits that include things such as chronic suicidality, chronic but intermittent, obviously, self-harming behaviors such as cutting or self-mutilation or burning, unstable interpersonal relationships." RC 2677.

Dr. Gold also concluded that, between October 26 and November 23, 2010, Waskiewicz "was not so functionally impaired that she was unable to make a phone call or send an email . . . advising her employer of her acute illness or asking a family member to communicate her need for leave to her employer." RC 2724. Dr. Gold based this opinion on what she referred to as direct evidence, indirect evidence, and evidence of functional capability as of November 23rd or 24th. RC 2698. Dr. Gold explained that the indirect evidence of Waskiewicz's capabilities was that Waskiewicz must have taken her daily insulin (because there is no evidence of a medical crisis that would have occurred had Waskiewicz stopped doing so); she was able to feed herself (she lost five pounds over a two-month period, which is not a dramatic weight loss); and she was able to continue feeding her dogs, even if she did not let them out of the house. RC 2698-2699, 2746. Direct evidence was the fact that Waskiewicz was able to go to Kroger and fill her prescription, and also chose to discontinue taking Effexor, her antidepressant. RC 2699. Finally, Dr. Gold observed that Waskiewicz "went into a flurry of activity" after she found out that she had been

terminated, that "demonstrates decisional capacity, cognitive capacity, and functional capacity." RC 2699-2700.

Dr. Gold explained that "elements of both impairment ('can't') and volitional choice ('won't') were present in October and November 2010." RC 2729. In her deposition, Dr. Gold said that Waskiewicz became very motivated to retain her employment, and "motivation can't change can't, but it changes won't." RC 2700. Dr. Gold opined that Waskiewicz's failure to contact her supervisor, Mr. Erickson, was "a volitional response to Mr. Erickson's attempt to set limits" by holding her accountable for her attendance issues. RC 2781. Dr. Gold's view was that "[n]o matter how miserable or depressed someone may feel, or what psychiatric diagnosis someone may have, unless impaired to a point near or at unconsciousness or coma or truly catatonic (not moving, not feeding oneself, not responsive to external stimuli, etc.), that person is presumed competent to meet the minimal requirement of advising an employer that the person is too ill to attend work or ask a family member to do so." RC 2766-2767.

## II. ANALYSIS

### A. Scope of Remand

As an initial matter, the parties dispute the scope of this Court's inquiry on remand. Waskiewicz contends that the Sixth Circuit issued a limited remand, instructing this Court only to examine whether Waskiewicz's "alleged failure to comply with certain of the requirements found in Section 3 of the Plan was due to the very disability for which she seeks benefits," Waskiewicz, 802 F.3d at 856. Pl. Mot. at 2 (Dkt. 148). She points to the three Section 3 requirements listed in UniCare's final denial of benefits letter: an individual must be an active employee with a disability; must be receiving appropriate care and treatment from a physician; and must provide proof of disability. Id. at 2-3. Waskiewicz spends most of her brief arguing that she was disabled during

the time period in question. Because she satisfies all three of the Section 3 requirements, Waskiewicz says, she is entitled to benefits. Id. at 3.

The Plan, on the other hand, argues that the relevant inquiry is whether Waskiewicz's claimed disability prevented her from "comply[ing] with the notification deadlines outlined in section 4.02 of the Plan," quoting Waskiewicz, 802 F.3d at 855. Def. Resp. at 1 (Dkt. 150). It contends that Waskiewicz chooses only to focus on a single sentence of the Sixth Circuit's opinion, and ignores the fact that the Sixth Circuit instructed that Waskiewicz could not be denied benefits if she proved that her disability prevented her from complying with the reporting deadlines prescribed by the Plan. Id. at 2. Essentially, the Plan contends that the Court should examine Waskiewicz's ability to comply with the reporting and notification requirements, while Waskiewicz seeks to focus the inquiry on her compliance with Section 3.

The Sixth Circuit's decision is admittedly ambiguous. The sentence regarding remand states that Waskiewicz "shall be given the opportunity to show that her alleged failure to comply with certain of the requirements found in Section 3 of the Plan was due to the very disability for which she seeks benefits." Waskiewicz, 802 F.3d at 856 (emphasis added). However, elsewhere in the opinion, the court had referenced Waskiewicz's ability to comply with reporting deadlines, stating that her failure to "comply with the notification deadlines outlined in Section 4.02 of the Plan" was unsurprising given her mental illness, id. at 855, and stating that it was "hard pressed to believe that plaintiff's failure to comply with reporting deadlines prescribed by the Plan should result in the denial of benefits as long as the failure to comply was directly caused by the disability itself," id. at 856.[4]

---

[4] It is "up to the employee to make that showing," said the court, despite having previously concluded that Waskiewicz "was unable to comply [with reporting deadlines] due to the very disability for which she sought coverage," id. at 855.

The Court finds it difficult to reconcile the references to compliance with "reporting deadlines" or "reporting requirements" with the order that the Court give Waskiewicz the opportunity to show that her failure to comply with Section 3's requirements was due to her disability. The requirements of Section 3 are <u>eligibility</u> requirements; they do not concern notifying Ford or UniCare. The Section 3 requirements highlighted by UniCare in its denial letter include being "an Active Employee with a Disability" and being "an Employee receiving appropriate care and treatment from a physician . . . ." The Court does not view these as "reporting" requirements.

The Sixth Circuit's concern seemed to be that Waskiewicz may have been denied benefits because her disability prevented her from taking steps necessary to obtain those benefits. The Court views the inquiry on remand as whether Waskiewicz's failure to comply with the reporting requirements was due to her disability.[5]

B.     **Reporting Procedures**

The question then becomes what Waskiewicz would need to do in order to report to Ford and/or UniCare and avoid a denial of her claim for benefits. Waskiewicz argues that she would have had to provide satisfactory medical documentation to Gate 4 Medical within five days, as outlined in Pettway's October 28, 2010 letter (which Waskiewicz did not receive until November 23, when it was attached to her termination letter). Pl. Mot. at 15-17. She points out that she did respond to Pettway's letter within five business days of receiving it, because she received it on

---

[5] While the Court originally applied an "arbitrary and capricious" standard to the denial of benefits decision, the Sixth Circuit did not indicate that a standard of review would be applicable on remand. Nor does the nature of the inquiry – focusing on Waskiewicz's ability to comply with reporting requirements and evaluated in part with information developed well after UniCare's decision to deny benefits – seem to be amenable to a standard of review analysis. Therefore, this Court answers the Sixth Circuit's inquiry without using the lens of a standard of review.

November 23 and Dr. Rockwell provided Gate 4 Medical with medical documentation regarding her disability on November 30.  Id. at 17-18.

The Plan's general argument is that Waskiewicz simply needed to contact Ford prior to November 18 to avoid termination.  Def. Resp. at 9.  The Plan acknowledges that Section 4.02 requires a covered salaried employee to give notice of absence no later than the sixth consecutive day of absence, but says that Waskiewicz was not terminated until November 18, 2010 – the twenty-fourth calendar day since she last worked.  Id.  It argues that whether Waskiewicz received Pettway's October 28 letter is irrelevant, and she cannot start a "new clock" based on the November 23 letter.  Id. at 24.  The Plan says that common sense, as well as prior experience,[6] would tell Waskiewicz that she could not fail to report to work for over a month without contacting her supervisor.  Id.

The Plan attaches a declaration from Katherine Baker, a Specialist – HR Policies for Ford. Baker stated the following regarding Waskiewicz's absence and notification procedures:

> Prior to November 18, 2010, the effective date of Laura Waskiewicz's termination, any communication received by Ford or UniCare that Ms. Waskiewicz needed a leave of absence would have caused such a leave to be opened by her supervisor, as described in paragraph 4.02 of the Plan.  Opening the leave would have given Ms. Waskiewicz at least 21 days, and more if reasonably necessary, to obtain and submit documentation (typically a doctor's certification based on examination) in an effort to qualify for both an approved leave of absence and disability benefits under the Plan. It is beyond the scope of my duties to predict the outcome of such a request had it been made, but Ford normally allows employees who have initiated this process a reasonable time to complete it.

Katherine Baker Decl., Ex. 1 to Def. Resp. to Mot. for J., ¶ 2 (Dkt. 150-1).

Section 4.02 of the Plan provides as follows:

> **Section 4.02 Filing a Disability Claim**.  A Covered Employee must notify the Claim Processor and the Company if the Employee is

---

[6] As noted above, Waskiewicz obtained a leave of absence in October 2009 and June 2010.

absent for more than five (5) consecutive Workdays. Formal notification must occur on the sixth absence day. Proof of Disability must be supplied to the Claims Processor within 21 calendar days of the Employee's last day of work or as soon thereafter as reasonably possible.

To make a claim for a Benefit under the Plan a Participant shall file a Disability claim by contacting the Company's Claim Processor and/or initiating a conditional disability leave of absence with the Company. The Covered Employee must report their physicians' full name, telephone number and any other pertinent information when the Employee contacts the Claim Processor. Benefits under the Plan will begin after the Claim Processor has verified that the Covered Employee has met all of the eligibility requirements under Section 3. Any payments by Company Payroll Services that are not authorized by the Claim Processor will be considered a Benefit overpayment, which will have to be repaid.

RC 154.

### C. Waskiewicz's ability to comply with the reporting requirements

The Court notes at the outset that it is difficult to decipher precisely what actions Waskiewicz needed to have taken to avoid a denial of benefits, as Section 4.02, the letter sent by Pettway, and the Baker Declaration each have different requirements.[7] Even determining what needed to be done would require a level of effort that, quite clearly, was not available to Waskiewicz during October and November 2010. See RC 2694 (Dr. Gold testified that Waskiewicz was unable to do "things that . . . would have required significant mental energy").

The Plan points out that Waskiewicz had previously applied for disability leaves, and she should therefore have known she needed to take action in October/November 2010. Def. Resp. at 10-11.[8] However, the records cited by the Plan show that in prior instances, Waskiewicz had the

---

[7] While the letter sent by Pettway pertains to Waskiewicz's ability to keep her job, and Section 4.02 pertains to applying for disability benefits, the Court views them both as "reporting requirements."

[8] The Plan also points out that Waskiewicz signed an agreement in February 2010 whereby she agreed to abide by certain attendance procedures: for example, she was supposed to call or email

15

assistance of her family in seeking medical care and availing herself of the disability process.  A May 14, 2010 note, which appears to be from Dr. Rockwell's office, states that Waskiewicz's sister called to inform that Waskiewicz was "severely depressed and will be terminated from [her] job on Monday," RC 2525; a note from June 8, 2010 states that Waskiewicz was "accompanied by [her] sister" and "ha[d] papers here for work or disability leave," RC 2527.  Waskiewicz's brother testified that he contacted Ford in September 2009 regarding Laura's absences from work.  RC 2290-2292.  In October and November of 2010, Waskiewicz did not have the assistance of a family member until her parents intervened in late November.

Nonetheless, the Court will address each requirement in turn.  The October 28, 2010 letter from Pettway quite clearly states that, if Waskiewicz wishes to remain employed, she must provide medical documentation directly to Gate 4 Medical within five business days.  RC 2894.  Putting aside the fact that Waskiewicz never received this letter, her disability prevented her from taking the steps necessary to retain her employment.  She would have had to initiate contact with Dr. Rockwell, explain her situation, receive medical documentation from Dr. Rockwell, and then provide this documentation to Gate 4 Medical.  Although Waskiewicz was able to do this in late November, once her parents intervened in her life, she was not able to do so within the time frame required by Pettway's letter.  As Dr. Gold explained, Waskiewicz may have been able to perform activities that "require[d] minimal energy, [for which] you don't have to leave your house to do,"

---

her supervisor no later than 8:30 a.m. if she was going to be tardy in arriving to work.  RC 2895. But this letter sets forth yet another notification procedure – it requires Waskiewicz to submit a "narrative letter" from her physician after any absence due to illness, which must include "a diagnosis, the number of days off ill and a return work date."  Id.  "The physician's letter must be signed by your attending physician (a stamped signature will not be allowed).  You must report to Gate 4 Medical located at 3001 Miller Road, Dearborn, MI 48121 with the letter and Medical will determine if time off is approved.  If the reason for your illness falls within the Family Medical Leave Act, please have your doctor explain this in the letter to Ford Medical and you should also notify Human Resources, Sue Moseley (313.594.6998)."  Id.

RC 2694, but she likely was unable to, for example, go to the post office to send a letter, RC 2695. Therefore, the Court concludes that Waskiewicz's disability prevented her from complying with any requirement set forth in this letter.

Section 4.02, which concerns the filing of a disability claim, requires an employee to "notify the Claim Processor <u>and</u> the Company if the Employee is absent for more than five (5) consecutive Workdays," and says that "<u>Formal</u> notification must occur on the sixth absence day." RC 154 (emphases added). It is not clear what "formal" notification requires, particularly with respect to notifying UniCare. Nor is it clear what must be contained in the notification. For example, is an employee required to provide any sort of medical documentation at this point? Is a simple announcement that the employee will not be returning to work sufficient? Would she need to request leave? Section 4.02 also requires proof of disability to be supplied to the Claims Processor within twenty-one calendar days of the employee's last day of work – here, November 15 – or "as soon thereafter as reasonably possible." RC 154.

Baker's declaration states that, by sending an email to her boss at some point before November 18, Waskiewicz would cause her supervisor to open a leave of absence for her – which in turn would have given Waskiewicz "at least" twenty-one days to submit documentation from her doctor regarding her disability. Baker Decl. ¶ 2. This seems to comport with the <u>second</u> paragraph of Section 4.02 – which states that, to make a claim for a benefit, a participant may "file a Disability claim by . . . initiating a conditional disability leave of absence with the Company," RC 154 – but it contradicts the requirements of the <u>first</u> paragraph. As just discussed, that portion of Section 4.02 requires an employee to provide formal notification to UniCare and Ford "on" the sixth day of an employee's absence from work. Thus, even if an informal email or phone call could initiate a conditional disability leave of absence, it does not seem that this alone would be

sufficient.  Waskiewicz would still need to formally notify UniCare and Ford – of <u>what</u>, the Court cannot tell –  "on" the sixth day of her absence.

Dr. Rockwell stated in a letter dated March 3, 2011 that Waskiewicz was "emotionally unable and incapable of interacting with others during the weeks prior to her appointment" with Dr. Rockwell.  RC 2944.  Similarly, Dr. Samons wrote on February 22, 2011 that Waskiewicz "was unable to follow standard procedure for obtaining a LOA [leave of absence]."  RC 128.

Dr. Gold concluded some seven years later that Waskiewicz "still had the minimal functional capacity to send an email or make a phone call had she wanted to do so," as these actions "require little effort and did not require Ms. Waskiewicz to leave her home or engage in social contact," RC 2745-2746.  She nonetheless opined that Waskiewicz was only able to do things that did not require "putting out energy and effort beyond a minimal sustaining level," RC 2694.

The Court concludes that contacting both Ford and UniCare within six days of her absence and providing some form of "formal notification" requires more than a minimal level of effort.  And the evidence shows that Waskiewicz would not have been able to do so during the time period in question, a conclusion undergirded by the opinions of numerous health professionals – Drs. Rockwell, Samons, and Gold – all attesting to Waskiewicz's severely impaired mental state.  Accordingly, Waskiewicz has shown that she was unable to comply with the reporting requirements in the Plan.

Even if the requirement were as simple as a phone call to her employer or a family member, there is ample evidence in the record that Waskiewicz's failure to make such call was directly caused by her disability.  Dr. Rockwell, who had treated Waskiewicz both before and after the period in question, stated her opinion that Waskiewicz was "incapable" of calling her family for support.  RC 2478.  Waskiewicz turned off her phone, and told Dr. Gold that if anyone had called

her, she would not have answered. RC 2694. This behavior is consistent with what her mother described – Waskiewicz would stay at home, isolated, sleeping for most of the day. RC 2453. She was able to do some tasks, but not others: while she fed her dogs, she did not let them outside. RC 2698-2699. She went to the store, but she did not open her mail. RC 2688, 2699.

Dr. Gold states that Waskiewicz "was capable of a certain amount of activity during that period that involved leaving the home, having some interactions with other people," RC 2688, and then equates this level of activity to making a phone call or sending an email, RC 2695. Dr. Gold opined, "if she could have done some of the other things, minimal as they were, I don't know why those [e-mail or leaving a voicemail] would be different. How were those functionally different? I can't come up with a reason why they're functionally different." Id. But this does not account for an obvious difference – Waskiewicz was upset about her job, and specifically about her supervisor, Erickson. According to Dr. Gold, a conversation between Erickson and Waskiewicz on October 25 "triggered a reaction that she had had multiple times in the past of feeling overwhelmed and unable to cope, and unfairly treated, and so she withdrew from work." RC 2685. Dr. Gold asked Waskiewicz why she had not asked her family to contact Ford, and apparently Waskiewicz "felt that the alternate communication system, as she called it or referred to it, had broken down because Mr. Erickson was mad at her." RC 2695. And elsewhere in the report, Dr. Gold refers to Waskiewicz's feelings that she was "unjustly admonished" by Erickson. RC 2779.

Thus, it seems that the idea of facing Erickson, or even work generally, may have been a distinguishing factor between making a simple phone call or refilling a prescription. And even to the extent that this was a choice "to spite Ford and Mr. Erickson by doing nothing," as the Plan frames it in its response, Def. Resp. at 23, Dr. Gold's report states that "most individuals with these beliefs [that rules do not apply to her], which are related to personality traits and/or a personality

disorder, demonstrate dysfunctional behavior in many areas of their lives," RC 2777 (emphasis added). Dr. Gold states that when a sense of entitlement – which she claims Waskiewicz had – is coupled with depression and distress from issues associated with "transgender problems," "self-defeating behavior and bad judgment are often seen." RC 2777-2778.

Dr. Gold also does not adequately explain her conclusions regarding motivation. She contends that the fact that Waskiewicz became motivated to act once she realized she had lost her job shows that her previous inaction was volitional, rather than due to incapability. See RC 2689. In her report, she says in a rather conclusory fashion that if Waskiewicz had "been in an entirely depressed, lethargic, and catatonic state . . . an external event like job termination . . . would not have improved functional capacity." RC 2783. In her deposition, she said that "[m]otivation can be a very significant factor in 'won't,' because with the right motivation, won't could turn into will . . . . No amount of motivation changed can't into can[.]" RC 2689. Dr. Gold used deafness as an example, explaining that "[]no matter how much you want to hear, you're not going to hear. Being motivated to hear if you are deaf is not going to help you hear." RC 2688. This explanation does not account for the nuances of mental illness as compared to a physical impairment. Dr. Gold opines that – notably, unlike deafness – functional capacity "ramp[s] up" rather than "go[es] from off one day to on another day," and therefore Waskiewicz must have had functional capacity prior to November 23. RC 2700. But Dr. Gold also allows that Waskiewicz's abilities during the time between October 25 and November 23 may have fluctuated, see RC 2688, such that she was capable of certain things at some times but not others. Dr. Gold does not fully explain why Waskiewicz's ability to act following her job loss and her parents' intervention shows that her prior inaction was volitional. There is ample evidence that Waskiewicz had been taking the minimal actions necessary to survive, but not much more. When her job was challenged, it seems

that these minimal actions, necessary to survive, changed.

Dr. Gold contends that Waskiewicz had the capability to reach out with a phone call or email, but simply chose not to. But Dr. Gold also stated that Waskiewicz's mental conditions predispose her to make "non-constructive, destructive, self-defeating choices." RC 2692. She explained that "depression and maladaptive personality traits can impair rationale [sic] decision-making. So, that it might not be rationale [sic] to say I'm not going to call or I'm not going to send an E-mail even though I've been worried about losing my job for 10 months. That's not rationale [sic]." RC 2690. And while Dr. Gold stresses that not reaching out to family or her employer was still a choice that Waskiewicz made, she allowed that Waskiewicz's choice "to follow the same pattern of behavior despite the consequences that she was aware on some level" was "to some extent[] characteristic of a person with maladaptive personality traits[.]" RC 2691.

Thus, the Court concludes that Waskiewicz has shown that her failure to comply with the reporting deadlines prescribed by the Plan was caused by the very disability for which she sought benefits. Judgment in her favor is warranted.

### III. CONCLUSION

For the reasons provided, the Court enters judgment in favor of Plaintiff Laura Waskiewicz.

SO ORDERED.

Dated:  March 22, 2019          s/Mark A. Goldsmith
    Detroit, Michigan           MARK A. GOLDSMITH
                            United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 22, 2019.

                            s/Karri Sandusky
                            Case Manager